AO 91 (Rev. 11/11) Criminal Complaint

**SEALED**

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

| | |
|---|---|
| United States of America<br>v.<br><br>CHASE BROWN<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 20-mj-3025<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 2019 to the present__ in the county of __Sangamon and elsewhere__ in the __Central__ District of __Illinois and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(5) | Access Device Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

See Attached

**FILED**
MAR 10 2020
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

☑ Continued on the attached sheet.

s/ Mason Posilkin

*Complainant's signature*

Mason Posilkin, FDIC-OIG SA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 10, 2020

s/ Sue E. Myerscough

*Judge's signature*

City and state: Springfield, IL

Sue E. Myerscough, United States District Judge
*Printed name and title*

STATE OF ILLINOIS        )
                         ) ss
COUNTY OF SANGAMON       )

## AFIDAVIT

Mason Posilkin, being first duly sworn, hereby deposes and states as follows:

1.      I am a Special Agent with the Federal Deposit Insurance Corporation, Office of the Inspector General. I previously served as a Special Agent with the United States Attorney's Office for the Southern District of New York and the United States Department of Labor Office of the Inspector General. In all of these roles I conducted white-collar investigations involving violations of wire fraud, mail fraud, access device fraud and identity theft.

2.      The information contained in this affidavit is based upon my personal knowledge of this investigation, and upon information provided by other law enforcement personnel. This affidavit does not contain all the facts know to agents, only those believed to be necessary to establish probable cause.

3.      This affidavit is made in support of an application for a complaint charging CHASE BROWN with access device fraud, in violation of 18 U.S.C. § 1029(a)(5), and wire fraud, in violation of 18 U.S.C. § 1343. A warrant for the arrest of CHASE BROWN is requested.

### Chase Brown-Midwest Surgical, LLC Overview

4.      Brown is a resident of Rochester, Illinois and is currently on probation with the State of Illinois after pleading guilty to a fraud related felony in Sangamon County Circuit Court (*People vs. Brown*, 2018-CF-001185).

5.      On May 3, 2019, Brown registered Midwest Surgical, LLC ("Midwest Surgical") with the State of Illinois with the principal office located at 11437 Wexford Drive, Mokena,

Illinois 60448. Brown listed himself as the manager and registered agent for the company. The address listed for Brown on the registration is 1012 Heathrow Lane, Rochester, Illinois. Midwest Surgical purports to be a medical equipment reseller.

6. Brown lists two addresses for Midwest Surgical on invoices and in emails with other medical equipment suppliers: 119 East Elm Street, O'Fallon, MO 63366 and 2801 South Lowell Street, Springfield, IL 62704.

7. According to the owner of 119 East Elm Street, Brown never leased space in the building or had any equipment on site. The owner of 2801 South Lowell Street did lease the building to Brown in or around August 2019, but had Brown evicted for failing to pay rent in or around November 2019.

### Scheme 1: Medical Sales Company-1

8. On or about November 25, 2019, the owner ("JD") of Medical Sales Company-1 ("DM Sales") located in Colleyville, Texas received a cold call from Brown from the phone number 217-891-7129. Brown told JD he was closing his medical supply business and had deals on medical equipment. Brown said he found JD through contacts in the medical equipment sales industry. JD agreed to purchase $22,000 of medical equipment from Brown, and pay half up front. Brown then sent JD a credit card payment authorization form via email from Chase@midwestsurgicalil.com.

9. JD had his employee ("SM") provide Brown the information for her DM Sales' American Express credit card ("DM Sales Amex-1"). Brown then asked JD for a second credit card because his card processor supposedly did not take American Express. On November 26, 2019, JD provided Brown with the information for his personal visa card ("JD Visa card") and signed an authorization form.

10. On November 27, 2019, Brown asked JD via text message for pictures of the two credit cards (DM Sales Amex-2 and the JD Visa card) and JD' drivers' license. Brown stated in the text message he needed the pictures because "…you were not here to swipe your card…" JD responded with the requested information, sending Brown pictures of the JD Visa card, and his DM Sales Amex-2.

11. Brown then told JD in sum and substance that he owned a car dealership and was using the dealerships' merchant account to process the credit card transaction for the medical equipment sale. Brown also told JD he created a purchase order from the dealership to document the charge. JD signed a receipt for the $11,000 charge from Car Dealership-1 assuming it was to process the sale of the medical equipment. At JDs' request, SM also sent Brown a picture of her drivers' license and the DM Sales Amex-1. That day, Car Dealership-1 charged $11,000 to the JD Visa card, and $11,000 to DM Sales Amex-1.

12. On November 27, 2019, through November 29, 2019, there were additional unauthorized charges on the JD Visa card and the DM Sales Amex-2 card. These include:

   a. $3,906.64 at Tire Store-1 in Springfield, IL;
   b. $1,600.00 at Car Dealership-2 in Springfield, IL;
   c. $1,095.50 at Sports Bar-1 in Springfield, IL; and,
   d. $5,000 at Law Office-1 in Springfield, IL.

13. JD never gave Brown his credit card information to make any charges other than for the purchase of the medical equipment. As of the present date, JD has not received any equipment from Brown.

14. On January 28, 2020, Affiant interviewed employees of Car Dealership-1, Tire Store-1, Car Dealership-2, and the owner of Sports Bar-1 regarding the above referenced transactions.

15. According to an employee ("FR") from Car Dealership-1. Brown purchased a Jeep Wrangler using the JD Visa card and the DM Sales Amex-1. Brown provided FR with credit card authorization forms signed by JD and his employee, SM. FR never spoke directly to JD or SM. FR emailed purchase agreements via DocuSign to SM and JD at emails provided by Brown. Both of the forms were electronically signed and returned via DocuSign. FR stated Brown never worked at Car Dealership-1, nor does Brown have any ownership interest in the dealership. Affiant spoke with SM and SM stated that she did not receive any DocuSign forms for this transaction and it is not her signature on the DocuSign form. Affiant spoke with JD and JD stated that he never signed a DocuSign form, (during an interview JD recalled receiving a DocuSign form, but not signing it) and neither of the emails provided by Brown belonged to JD or SM. JD has never heard of the email domain provided by Brown. Since Medical Sales Company-1 is an incorporated company (Inc.), not a limited liability corporation (LLC), JD said it would not make sense to have this email handle.

16. According to the owner of Sports Bar-1 ("TD"), on November 27, 2019, Brown charged a $595.50 bar tab using the DM Sales Amex-2 card and added a $500 tip onto the bill for a final charge of $1,095.50.

17. According to the manager of Tire Store-1 ("JC"), on November 28, 2019, Brown came to the store to purchase wheels and tires for a Jeep Wrangler. Brown told a sales associate he owns Midwest Surgical, LLC, a medical supply company. To complete the $3,906.64 purchase, Brown verbally provided a Tire Store-1 sales associate the credit card information for

4

the DM Sales Amex-2 card. The phone number listed for Brown on the sales receipt is 217-891-1729.

18.     According to an employee of Car Dealership-2 ("EA"), on November 29, 2019, an individual ("DB") purchased a vehicle from the dealership. Brown was with DB during the purchase. DB told EA that Brown owed him money, and was there to help with the down payment. Brown verbally provided EA with credit card information for the DM Sales Amex-2 card to pay $1,600 of DB's down payment.

19.     JD asked Brown via text message about the $5,000 charge from Law Office-1 on the JD Visa card. Brown replied "they [Law Office-1] should not have your card information to run it though so I am unsure on how that would happen…"

20.     A law enforcement officer spoke with a representative from Law Office-1 and learned Brown provided the JD Visa card as payment for a $5,000 retainer for legal services.

### Scheme 2: Fuel Company-1

21.     Fuel Company-1 is a Miami, FL based company providing energy procurement services. The company offers customers a charge card ("AV Card") to pay for costs associated with private aviation to include fuel, catering and aircraft maintenance.

22.     On December 1, 2019, Brown completed an online application for an AV Card. In the application, Brown stated that he was the CEO of Midwest Surgical, LLC. Brown provided the phone number 217-891-7129 and the email addresses Chase@midwestsurgicalil.com and Chase.Brown1999@gmail.com on the application. Additionally, Fuel Company-1 emailed Accounting@midwestsurgicalil.com regarding invoices for the card balance.

23.     Brown stated in the application that the annual revenue for Midwest Surgical, LLC was $18,628,936, and the company had 26 employees. However, to date, the investigation

5

has revealed Brown did not make payments owed to other suppliers for medical equipment purchases, failed to deliver medical equipment to multiple vendors after receiving payment, wrote multiple checks from a bank account he controls which were returned for insufficient funds, used his mothers' bank account to conduct business, and has not carried a balance of more than $15,000 in any of his bank accounts reviewed to date. As a result, it is believed that at the time of the application, the annual revenue for Midwest Surgical was not in excess of $18 million dollars.

24. Additionally, the only evidence regarding employees for Midwest Surgical appears to be a contract from a temporary staffing company hired by Midwest Surgical for eight temporary employees who worked between 2-30 hours in total. This staffing company later filed a lawsuit against Brown in the Sangamon County Circuit Court for failing to make payment, after Brown wrote a check for the balance of the invoice without sufficient funds in his bank account.

25. As a result of the application, and in addition to a credit check on Midwest Surgical, Fuel Company-1 approved the AV Card. Fuel Company-1 mailed Brown a physical card from Miami, FL to Springfield, IL. According to shipping records, Brown signed for the card. Fuel Company-1 subsequently granted several credit line increases, allowing Brown to charge $234,434.89 on the AV Card between in or around December 2019 through in or around January 2020. These charges consisted of fuel, private charter flights, and plane maintenance, including approximately $4,500 in purchases from Aviation Company-1 ("SV") in Springfield, IL.

26. A credit officer from Fuel Company-1 reviewed an Experian credit report for Midwest Surgical when evaluating the Midwest Surgical application for the AV card. The

Experian report shows Midwest Surgical has $2,865,000 in sales as of January 6, 2020. Per the reasons described in paragraphs 23-24 above describing revenue for the company, it is unlikely Midwest Surgical generated this much in sales given (1) the de minimus account activity on the bank accounts reviewed to date, (2) Midwest Surgical failed to make payments to other vendors, (3) the company did not deliver equipment after receiving payment, (4) Brown bounced multiple checks to other companies including a hospital operator and staffing company, (5) and Midwest Surgical was evicted for failing to pay rent.

27.    In or around January 2020, Brown attempted to make additional purchases on the AV Card in excess of his credit limit. As a result, Fuel Company-1 asked Brown to make a payment on his card balance. On January 13, 2020, Brown emailed a Fuel Company-1 employee from Chase.Brown1999@gmail.com stating he wired the funds to pay part of the outstanding card balance. He sent the Fuel Company-1 employee a screenshot of a wire confirmation from an account at WinTrust bank. Per Fuel Company-1's records, this wire was never received, and as a result, Fuel Company-1 froze Brown's AV card. To date, Fuel Company-1 has not received payment from Brown.

28.    The screenshot Brown sent the Fuel Company-1 employee referenced a wire from WinTrust Bank in the amount of $128,750 by order of Chase Brown with an account ending in X3975 and the address 2416 Checkerberry Lane, Springfield, IL 62704. According to an employee of WinTrust bank, neither Brown nor Midwest Surgical have any accounts with the bank. Additionally, there are no accounts associated with 2416 Checkerberry Lane, Springfield, IL. The employee found a record of a wire transfer a WinTrust customer tried to send Brown. This transfer was not completed. To placate Fuel Company-1, Brown may have manipulated the

7

information from the wiring details the WinTrust customer sent him, in order to make it appear Brown had an account with WinTrust Bank.

### Scheme 3: Medical Sales Company-2

29. In or around August 2019, Brown called the owner of Medical Sales Company-2 ("JR") located in Avondale, PA. Brown told JR he purchased medical equipment from a hospital and needed a buyer for several fusion pumps. JR agreed to purchase $13,000 in equipment from Brown. Brown sent JR pictures of the equipment via email from Chase.Brown1999@gmail.com and by text message from 217-891-7129. Additionally, Brown sent JR emails from Chase@midwestsurgicalil.com including an invoice. In one of the emails, Brown told JR the equipment would be picked up from 119 East Elm Street, O'Fallon, MO 63366. However, as referenced in paragraph 7 above, Brown did not have an office or any equipment at this location. This address is also listed on the Midwest Surgical invoice Brown emailed to JR.

30. On August 22, 2019, JR wired Brown $13,000 from the Medical Sales Company-2's bank account at Wells Fargo Bank to Julie Brown's personal checking account at the Illinois National Bank in Springfield, IL. Julie Brown is Chase Brown's mother. JR did not receive the equipment from Brown, and as a result tried to recall the wire. However, Wells Fargo was unable to recall the funds. To date, JR has not received the equipment from Brown or repayment of the funds.

31. The records for Julie Brown's Illinois National Bank show the day after the $13,000 wire from Medical Sales Company-2 is credited to the account, there is an outgoing wire to the Camden County, MO courts for $5,968.56, and on August 30, 2019, there is a $6,000 wire to Black Thunder Off Shore Power Boat.

### Scheme Four: Medical Sales Company-3

32.  In or around late August or early September 2019, the owner of Medical Sales Company-3 ("DT") met Brown at the Medical Sales Company-3's office in Niles, IL. Brown came to the office to pick up medical equipment for another medical supplier. During the pickup, Brown told DT he also buys and sells medical equipment through his company Midwest Surgical.

33.  DT agreed to sell Brown two separate orders of equipment; the first order for $13,000 and the second order for $35,000. DT wanted the check at the time of purchase for the second order as Brown had not paid DT for the first order, even though DT provided the equipment. Brown attempted to pay DT for the second order with a $35,000 check dated September 13, 2019, drawn from a Wells Fargo Bank account ending in X8052. When DT went to cash the check it was returned because the check was drawn from a closed account. Additionally, there is no record of this check being drawn from the account or being returned unpaid since Brown provided the check after the account was closed.

34.  After the check was returned, DT contacted Brown asking for payment on the $35,000 invoice. Brown told DT he would send the payment via PayPal. When DT received the PayPal payment, he noticed the payments were not from Brown, but from other medical supply resellers. These companies then contacted DT demanding medical equipment. DT spoke to representatives from each of the companies. All of them told DT they purchased equipment from Brown, who directed them to pay DT using PayPal. However, none of the companies received any equipment. As a result, DT refunded the money to these companies, and demanded Brown pay him or return the equipment.

9

35. When Brown retuned to DT's office, DT told Brown he must pay him the outstanding balance, or DT would go to the police. Brown told DT he would pay him $3,000 cash if he agreed not to go to the police, and would mail a $9,000 cashier's check immediately. Brown paid DT the $3,000 and then left DT's office.

36. DT then received a $9,000 cashier's check from Brown via FedEx, According to the FedEx label, the check was sent from Springfield, IL. However, the check was made payable to Chase Brown, so DT could not cash the check himself.

37. DT contacted Brown regarding the check, and Brown agreed to go with DT in person to a JP Morgan Chase branch to cash the check. When Brown and DT went to a JPMC branch in the Niles, IL area, Brown was unable to cash the check. Brown then told DT they needed to go to DeWitt Savings Bank in Clinton, IL to cash the check. DT drove to the DeWitt Savings Bank branch at 302 W. Main Street, Clinton, IL and met Brown. Brown went into the bank, cashed the check and gave DT the $9,000. To date, DT is still owed $36,000 ($1,000 from the first order and $35,000 from the second order).

## Midwest Surgical and Chase Brown Financial Accounts

38. Records from several bank and other financial accounts associated with Chase Brown and Midwest Surgical were reviewed and analyzed. Brown wrote multiple checks from at least two bank accounts without sufficient funds to cover the checks, and wrote checks drawn from the accounts after these accounts were closed by the bank. Additionally, while Midwest Surgical purported to have over $18 million dollars in sales, there is de minimums activity in the bank accounts associated with Brown and the company.

39. On January 17, 2018, Brown opened a JP Morgan Chase Bank (JPMC) checking account ending in X6065. The account was active from January 17, 2018, through February 6,

2018, when JPMC charged off the account. During this time, the account never had a balance higher than $40. However, Brown wrote multiple checks from the account without sufficient funds. The following example includes:

    a.    Check #1079 written on January 31, 2018, payable to an Alfa Romeo dealership for $10,000 with the memo line 'down payment'.

40.    On September 25, 2019, Brown opened a JPMC checking account ending in X3975. Checks drawn from the account have the header of Midwest Surgical, LLC. The account was active from September 25, 2019, through November 6, 2019, when JPMC closed the account via a charge-off. During this time, the account never had a balance higher than $1,800. The account received only $3,693.85 in deposits. However, Brown wrote multiple checks from the account without sufficient funds. The following examples include:

    a.    Check #2479 written on October 1, 2019, payable to a lake resort in Missouri in the amount of $8,586.07.

    b.    Check #2486 written on October 10, 2019, payable to a limited liability corporation for $2,700 with the memo line 'October Rent'. This limited liability corporation is the entity for the property owner of 2801 South Lowell Street in Springfield, IL where Brown leased space for Midwest Surgical. As described above, this landlord is suing Brown for failing to pay rent, and had Brown evicted from the property. This check was deposited at the Marine Bank in Springfield, IL on October 16, 2019. At no time between when the check was written and deposited did account X3975 have a balance of $2,700.

    c.    Check #4740 written on October 24, 2019, payable to an individual with the initials "SS" for $100,000.

    d.    Check # 4739 written on October 24, 2019, payable to a medical provider in the amount of $375,000 with the memo "1st Down Payment."

    e.    Check #4745 written on November 1, 2019, payable to CMC Inc. for $17,944.50.

41.    On April 4, 2019, Brown opened a Wells Fargo checking account ending in X8052. He listed the email Chase.Brown1999@gmail.com on the account opening document.

The account was active from April 4, 2019, through September 6, 2019, when the account was charged off by Wells Fargo. The account never had a balance of more than $10,000. However, as referenced in paragraph 33 above, Brown wrote the below check drawn from the account:

    a.    Check # 7246 written on September 13, 2019, payable to Medical Sales Company-3 for $35,000. The check was written after Wells Fargo closed the account on September 6, 2019.

42.    On August 23, 2019, Brown created a Square account for Midwest Surgical, LLC. The phone number listed for the account was 217-891-7129 and the email address was Chase@Midwestsurgical.com. The bank account linked to Square is Julie Brown's checking account at the Illinois National Bank. Square froze the account on September 11, 2019. While the account was open there was only $36,263.10 worth of activity of which $12,000 were charges refunded to Medical Sales Company-3 and $8,003.10 were charges refunded to Medical Sales Company-5 both of which are medical equipment resellers.

### Additional Schemes

43.    **"JG"** is a resident of Springfield, IL and works for Jewelry Store-1. In or around January 2020, JG was in Miami, Florida on a business trip. While on the trip, Brown contacted JG to meet in Miami. JG knows Brown from Springfield, and previously mentioned to Brown he would be in Miami for business. Brown met JG in Miami and slept on the couch in JG's hotel room. Brown asked JG to come with him to Los Angeles, CA, so Brown could sell some watches. Brown asked for JG to pay for his flight since Brown said he lost his debit card. Brown told JG his private airplane was in Los Angeles, CA. JG paid for their tickets, and Brown and JG flew to Los Angeles. While in Los Angeles they stayed in a rental home arranged by Brown. Brown and JG flew on a private jet from Los Angeles to Ontario, CA so Brown could purchase a tiger. At the time, JG did not know how Brown paid for the use of this jet, or if he owned the jet.

Once in Ontario, the tiger purchase did not take place so they flew back to Los Angeles. Brown and JG were then confronted by the rental owner who accused Brown of failing to pay for the rental.

44. JG returned to Springfield, IL and learned from his father that Brown made two charges with private jet companies using JG's credit card: $12,273.56 from Apollo Jets and $12,996.75 from Priority One Jets. JG never gave Brown his credit card nor gave Brown permission to use his credit card. JG believes Brown may have taken pictures of his credit card and drivers' license while staying with JG in Miami. JG's father is the primary card holder for JG's credit card.

45. On January 17, 2020, JG's father received a call from Brown's attorney stating Brown was scared he was going to be arrested upon his return to Springfield, IL. JG's father told the attorney in sum and substance that Brown needed to repay JG's father for the charges from the jet companies. The next day, the attorney told JG's father that Brown was wiring funds to the jet companies to pay for the charges.

46. Per Priority Jets records, Brown contacted the company on January 15, 2020, to lease a jet from Los Angeles to Arcata, CA. Brown signed a DocuSign contract and sent pictures of JG's credit card and drivers' license as payment. Priority Jets dispatched a plane to Los Angeles to pick up Brown, but he did not show up for the flight. Priority Jets sent the quote for the jet to Chase.Brown1999@gmail.com.

47. When a law enforcement officer contacted Priority One Jets, a representative told him Brown claimed to have paid the balance via a wire, but the wire was never received. Brown sent a text message with the wire confirmation to Priority One Jets showing a wire for $13,000 from a Wells Fargo Bank in his name ending in X3975. According to records from Wells Fargo,

13

Brown does not have an account ending in X3975, and the account Brown did have with the bank was closed on September 6, 2019. Also, '3975' are the same ending digits for the account number on the wire confirmation Brown sent to Fuel Company-1 purportedly from WinTrust Bank (See paragraphs 27-28 above). Brown did have an account with JP Morgan Chase ending in X3975, but this account was closed on November 6, 2019, and never carried a balance higher than $1,800.

48.   **Medical Sales Company-4.** In or around August 2019, Brown contacted the CEO of Medical Sales Company-4 ("MN"), a medical supply company in Mokena, Illinois and advised him that he was selling used medical equipment through his company Midwest Surgical. MN agreed to make several purchases from Brown. Brown sent the Medical Sales Company-4 purchase orders via email using Chase@midwestsurgicalil.com. The phone number in the signature block for this email is 217-891-7129. Additionally, Medical Sales Company-4 received emails from accounting@midwestsurgicalil.com regarding payment for purchases. For the first two purchase orders, Medical Sales Company-4 paid Brown via a wire from their account at First Midwest Bank to Brown's mother Julie Brown's account at Illinois National Bank. Medical Sales Company-4 received the equipment for these two orders.

49.   For the next two purchase orders, MN and Brown agreed that MN would prepay 50% of the invoice price. On September 5, 2019, Medical Sales Company-4 wired $9,450 from their account at First Midwest Bank to Julie Brown's account at Illinois National Bank as prepayment for an order. Subsequently, Brown asked Medical Sales Company-4 to pay by credit instead of wire. A Medical Sales Company-4 employee provided Brown with the Medical Sales Company-4 American Express credit card. After providing Brown the card, the employee observed three charges for $4,000 during September 10-11, 2019. Per the purchase order, there

should only have been one $4,000 charge. According to records received from Square Inc., the credit card processor used by Brown, he charged the Medical Sales Company-4 American Express card three times. As a result, Medical Sales Company-4 had American Express reverse the charges, and instead wired the $4,000 payment to Julie Brown's Illinois National Bank account. After the unauthorized charges on the Medical Sales Company-4 card, Nelson cancelled the orders from Midwest Surgical. To date, Medical Sales Company-4 never received the refund for the $9,450 and $4,000 prepayments, or the equipment. Brown stopped responding to emails and calls from Medical Supply Company-4 after they asked for the refund.

50. **Medical Sales Company-5.** "MT" is the owner of Medical Sales Company-5 based in Jackson, TN. In or around September 2019, Brown contacted MT offering to sell equipment through Midwest Surgical. MT agreed to purchase equipment from Brown and provided his American Express credit card. After charging MT's card $8,003.10 for the equipment, Brown told MT he was having trouble with his card processor. As a result, MT called American Express and had the charge reversed. Brown then asked MT to wire him funds, but MT declined. As a result, MT cancelled the purchase. Brown provided an employee of Medical Sales Company-5 with the contact email addresses Chase@Midwestsurgical.com and telephone number 217-891-7129.

51. **Hospital-1** was a hospital in Blue Island, Illinois. During the hospital's closure, Hospital-1 entered into a consignment agreement with Midwest Surgical to sell the hospital's equipment and supplies. Per the agreement, Brown was required to make two payments of $375,000 to Hospital-1. Brown provided Hospital-1 a check for $375,000 drawn from his account with JPMC which was returned due to insufficient funds. Brown also represented to Hospital-1that he made a wire transfer of $375,000, which Hospital-1 never received. Similar to

15

the wire transfer information Brown provided to Fuel Company-1 and Priority One Jets, this wire purported to be from a bank account in X3975. Ultimately, Brown returned the products to Hospital-1 with the exception of $10,000 worth of equipment for which Hospital-1 did not receive payment.

52.  "SS" met Brown at Lake of the Ozarks, MO in or around summer of 2019. Brown agreed to purchase SS's boat for $490,000. Brown wanted to establish a racing team in Florida to compete using the boat. Brown paid SS via a $100,000 check which was returned for insufficient funds, and then a purported wire transfer for $495,000 which SS never received. Similar to the wire transfer records Brown sent Fuel Company-1, Priority One Jets and Hospital-1, this wire was from an account ending in X3975. The wire receipt was sent from accounting@midwestsurgicalil.com. The email was from "Mallory Kurza," the "CEO Assistant." According to a law enforcement database, no such person exists with this name. As a result of the non-payment, SS never sent the boat to Brown. SS also stated Competition Marine Inc. performed worked on the boat in preparation for the race as requested by Brown but was never paid. According to Brown's bank records, there was a check written on November 1, 2019, payable to "CMC Inc" for $17,944.50, which was returned due to insufficient funds.

s/ Mason Posilkin

Special Agent Mason Posilkin
Federal Deposit Insurance Corporation
Office of the Inspector General

Subscribed and sworn to before me this
10th day of March, 2020.

s/ Sue E. Myerscough

SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE